DECISION
Plaintiffs have brought this declaratory judgment action in an effort to establish that they are the true owners of an undeveloped 8 acre tract of land in South Kingstown, Rhode Island that Defendant claims is part of a larger, 26.5 acre improved parcel of land to which it claims title. This Court appointed a Special Master to examine the chain of title with respect to the property in dispute. Before this Court is a Motion for Summary Judgment, as well as a Motion to Confirm the Special Master's Report, filed by Defendant East Hills, Inc. Plaintiffs object to these motions. For the reasons set forth in this Decision, this Court grants Defendant's Motion for Summary Judgment and addresses the Special Master's Report in that context.
 I Facts and Travel A Parties and Background
Defendant East Hills, Inc. is the occupant of a certain tract of land along the east side of Long Pond in the Town of South Kingstown (the "Subject Tract"). The Subject Tract is comprised of approximately 26 ½ acres and is situated at 2717P Commander Oliver Hazard Perry Highway. It is more particularly described as Lot 28 on Town of South Kingstown Tax Assessor's Plat 74. *Page 2 
Plaintiffs Fred M. Hazard, Millicent I. Smalley, Andrea M. Hazard, and Laurel Y. Hazard are the great-great-great grandchildren of Alexander P. Hazard, whom they claim was the illegitimate son of Dr. George Hazard. Plaintiffs claim further that an 8 acre tract historically belonging to Dr. George Hazard ("8 Acre Tract") is situated within the Subject Tract and was never conveyed to Defendant, its predecessors in interest, or any other party by Dr. George Hazard or any of his descendants. Plaintiffs contend, therefore, that they, as descendants of Alexander P. Hazard, are the owners of the 8 Acre Tract within the Subject Tract.
In 1895, Violet Hazard, widow of Alexander P. Hazard and great-great-great grandmother of Plaintiffs, conveyed two parcels of land to George R. Hazard[1] via quitclaim deed recorded in the Land Evidence Records in Book 33, Pages 496-498. The two pieces of land comprised a 15 acre parcel and a 7 ½ acre parcel ("15 Acre Tract" and "7 ½ Acre Tract"). In 1909, George R. Hazard and William F. Price created and recorded an agreement ("1909 Boundary Agreement) that — along with a subsequent agreement between George R. Hazard and William B. Weeden — shaped the boundaries of the Subject Tract as they exist today. The Plaintiffs, however, claim that the 1895 conveyance was invalid[2] and that the 1909 Boundary Agreement improperly excluded their ancestors. *Page 3 
Upon the death of George R. Hazard, the Subject Tract was held in trust, per the terms of his will, for the benefit of his as yet unascertained grandchildren. In 1981, George R. Hazard's daughter, Sarah H. Nomer, and her husband Harold A. Nomer, purchased the Subject Tract from the trust for valuable consideration, receiving a Fiduciary Deed from the Trustee under the will. In the same year, Sarah and Harold Nomer formed East Hills, Inc. as a nonprofit, non-shareholder corporation chartered by the State of New York and the State of Rhode Island for the express purpose of holding the Subject Tract for the benefit of the descendants of George R. Hazard and Francis M. Hazard. Sarah H. Nomer deeded the Subject Tract by quitclaim deed to East Hills, Inc. on January 23, 1989, such deed being recorded in the Land Evidence Records in Book 354, Page 45. The current members of East Hills, Inc. are Harold Nomer, the three grandchildren of George R. Hazard, and the spouses of those grandchildren.
 B Procedural Posture
On August 20, 2007, Plaintiffs filed this declaratory judgment action asking this Court to: "(1) declar[e] the rights and interests of the parties to the Subject Tract . . .; (2) declar[e] that [P]laintiffs are the true legal owners of the [8 Acre Tract] . . .; (3) declar[e] null and void the purported deed dated October 19, 1895 from Violet Hazard to George R. Hazard upon which [D]efendant's purported title to the Subject Tract rests; [and] (4) declar[e] that the `Plat of Lands' recorded in 1909 . . . does not in fact accurately describe the lands then owned by George R. Hazard but indeed includes [the 8 Acre Tract] then still owned by Violet Hazard and now owned by [P]laintiffs." (Compl. at ¶¶ 1-4). Plaintiffs argue that George R. Hazard did not own a part of the Subject Tract (specifically the 8 Acre Tract) and, therefore, "had no power to convey all such land . . . or to duly pass title to the same to his successors in interest, including the defendant East Hills, Inc." (Compl. at ¶ 11). *Page 4 
On September 6, 2007, Defendant filed an answer and asserted several affirmative defenses, including laches. Defendant also filed a two-count Counterclaim for: (1) adverse possession under R.I. Gen. Laws § 34-7-1; and (2) bad faith. As part of its adverse possession claim, Defendant seeks to be adjudged as owner in fee simple of the Subject Tract, including the 8 Acre Tract. (Counterclaim, Count I). Plaintiffs answered the Defendant's Counterclaim, also asserting a defense of laches.
On December 3, 2009, Defendant filed a Motion for Summary Judgment, pursuant to Rule 56 of the Rhode Island Superior Court Rules of Civil Procedure, and a supporting memorandum of law, [3] arguing that Plaintiffs' Complaint is barred by the doctrine of laches and that, regardless of record title to the Subject Tract, Defendant has satisfied the elements of adverse possession as to the Subject Tract as a matter of law. On April 13, 2010, Plaintiffs filed a Memorandum in Opposition to Defendant's Motion for Summary Judgment to which they attached the Affidavit of Fred M. Hazard (and attachments) and Plaintiffs' Answers to Defendant's Interrogatories.
On May 3, 2010, Defendant filed a Supplemental Memorandum of Law in Support of Defendant's Motion for Summary Judgment, which made clarifications to the Defendant's laches and adverse possession claims. On May 7, 2010, Plaintiffs filed a Supplemental Affidavit of Fred M. Hazard pursuant to Rule 56(f). Thereafter, the Court took a view of the Subject Tract.
By order entered on June 8, 2010, this Court appointed Charles S. Soloveitzik, Esq. as a Special Master to report to this Court "the chain of title of the parcels that now comprise the tract more particularly describe[d] as Lot [28] on Town of South Kingstown Tax Assessor's Plat 74." (Order of Reference to Special Master). The Special Master submitted his report on September 7, 2010. *Page 5 
He confirmed that the titles to the 15 Acre Tract and the 7 ½ Acre Tract passed from Violet Hazard to George R. Hazard in 1895, but he was unable to describe the devolution of the 8 Acre Tract. Applying a liberal interpretation to the Rhode Island Marketable Record Title Act, R.I. Gen. Laws §§ 34-13.1-1 et seq., the Special Master concluded that Defendant possesses record title to the entire Subject Tract, including the 8 Acre Tract.
On October 14, 2010, Defendant filed a Motion to Confirm the Special Master's Report. Also on October 14, 2010, Defendant filed an additional Supplemental Memorandum of Law in Support of Defendant's Motion for Summary Judgment, arguing that "[s]ummary [j]udgment [s]hould be [g]ranted [b]ecause Defendant and Defendant's [p]redecessors in [i]nterest [h]ave [r]ecord [t]itle to the [S]ubject [T]ract." (Suppl. Mem. of Law in Supp. of Def.'s Mot. for Summ. J. 2). On November 15, 2010, the Plaintiffs filed a memorandum in opposition to the Motion to Confirm the Special Master's Report.[4] On November 18, 2010, Plaintiffs filed a second Supplemental Affidavit of Fred M. Hazard. By letter dated November 22, 2010, Defendant submitted to the Court a boundary survey of the Subject Tract. On December 8, 2010, Defendant submitted supplemental case law to the Court.
The Court entertained extensive oral argument on Defendant's Motion for Summary Judgment on December 3, 2010 and reserved decision pending further review of the parties' memoranda and arguments. In the course of that review, this Court discovered that the Special Master does not list Alex P. Hazard as a child born to Dr. George Hazard in his report. Yet, Plaintiffs maintain Alex P. Hazard was born out of wedlock and that "Alex P. Hazard's white father was Dr. George Hazard." (Supp. Aff. of Fred M. Hazard ¶ 9.) This Court then convened *Page 6 
a conference with all counsel to raise the issue of whether Alex P. Hazard, as the alleged illegitimate heir of Dr. George Hazard, could have acquired an interest in the 8 Acre Tract through intestate succession under the law at the time. If he could not, the Court suggested that Plaintiffs, as his alleged heirs, might not have standing to bring this action. After this Court raised the issue of standing, the parties sought and the Court granted them leave to brief the standing issue. Plaintiffs submitted a Memorandum on Issue of Intestate Succession of Illegitimate Heir on December 20, 2010. Defendant submitted a Response to Plaintiffs' Memorandum of Law Regarding Intestate Succession on December 28, 2010.
After consideration of all the memoranda submitted by the parties, their oral arguments and the Report of the Special Master, this Decision follows. This Court will address the Defendant's Motion for Summary Judgment and its Motion to Confirm the Special Master's Report, as well as Plaintiffs' objections to those motions.[5] *Page 7 
 II Standard of Review A Summary Judgment
In considering a summary judgment motion, this Court reviews the evidence and draws all reasonable inferences in a light most favorable to the non-moving party. Chavers v. Fleet Bank (RI),N.A., 844 A.2d 666, 669 (R.I. 2004). The Court is to determine whether any factual issues exist, but it is not permitted to resolve any such issues of fact. O'Connor v. McKanna,359 A.2d 350, 353 (R.I. 1976); Palazzo v. Big G Supermarkets,Inc., 292 A.2d 235, 237 (R.I. 1972); Slefkin v.Tarkomian, 238 A.2d 742, 742 (R.I. 1968). A party opposing a motion for summary judgment "`carries the burden of proving by competent evidence the existence of a disputed material issue of fact and cannot rest on allegations or denials in the pleadings or on conclusions or legal opinions.'" Id. at 669-70 (quotingUnited Lending Corp. v. City of Providence,827 A.2d 626, 631 (R.I. 2003)). "Summary judgment is appropriate if it is apparent that no material issues of fact exist and the moving party is entitled to judgment as a matter of law."Chavers, 844 A.2d at 669.
 B Confirmation of the Special Master's Report
Pursuant to "Rule 53(e)(2), a Superior Court justice is bound to accept the master's findings of fact unless `clearly erroneous.'"Petition of Slater, 275 A.2d 272, 276 (R.I. 1971). The Rhode Island Supreme Court has held that "[a] finding of fact is `clearly erroneous' when the totality of the evidence leaves the reviewing court with a definite and firm conviction that mistake has occurred." Dickinson v. Killheffer,497 A.2d 307, 311 (1985) (quoting In re Derek, *Page 8 448 A.2d 765, 767 (1982)). A special master's conclusions of law, however, are freely reviewable by the Court. See R.I. Super Ct. R. Civ. P. 53 (e)(1), (4).
 III Analysis A Summary Judgment 1 Laches
As a threshold matter, this Court will address the issue of laches. Defendant argues that Plaintiffs' complaint is barred by the doctrine of laches. It contends that Plaintiffs have failed to explain and justify a delay of 112 years in bringing this action and that the delay of over a century has so prejudiced Defendant in its ability to defend their claims that this Court should grant summary judgment in its favor. Plaintiffs counter this argument by claiming that previous generations of their family were unsophisticated and hence did not bring this action sooner.
Laches is a defense that precludes a lawsuit by a plaintiff who has "negligently sat on his or her rights to the detriment of the defendant." O'Reilly v. Town of Glocester,621 A.2d 697, 702 (R.I. 1993). The defense of laches requires both a plaintiff's unexplained or unjustified delay in asserting rights and also a defendant's detrimental reliance on the status quo.Adam v. Adam, 624 A.2d 1093, 1096 (R.I 1993). The Rhode Island Supreme Court, therefore, applies a two-part test to determine if laches applies, requiring proof of: 1) "negligence on the part of the plaintiff that leads to a delay in the prosecution of the case;" and 2) "delay [that] prejudice[s] the defendant."O'Reilly, 621 A.2d at 702. The Court has highlighted that "the disadvantage [to the defendant] may come from loss of evidence, change of title, intervention of equities and other causes."Chase v. Chase, 37 A.804, 805 (R.I. 1897). When the resulting harm or disadvantage is great, a relatively brief period of delay may suffice, while a similar period of delay under other *Page 9 
circumstances may not. City of Paducah v. Gillispie,115 S.W. 2d 574 (Ky. 1938). In the context of a title dispute, laches:
 prevents the resurrection of stale titles, and forbids the spying out from the records of ancient and abandoned rights. It requires of every owner that he take care of his property, and of every claimant that he make known his claims. It gives to the actual and longer possessor security, and induces and justifies him in all efforts to improve and make valuable the property he holds. It is a doctrine received with favor, because its proper application works out justice and equity, and often bars the holder of a mere technical right, which he has abandoned for years, from enforcing it when its enforcement will work large injury to many.
Naddo v. Brandon,51 F. 493, 495 (8th Cir. 1892).
Here, 178 years passed between the death of Dr. George Hazard and the commencement of this action. One hundred twelve years elapsed between the transaction in which Violet Hazard deeded the 15 and 7 ½ Acre Tracts to George R. Hazard and the filing of this case. At a minimum, therefore, over a century has elapsed since Plaintiffs or their predecessors could have brought this action. This Court would suggest that sitting on one's legal rights for over a century could be characterized as negligence perse. See, e.g., Womack v. San FranciscoCommunity College Dist., 147 Cal. App. 4th 854, 865 (Cal. Ct. App. 2007) (holding that a nine-year delay was per se
unreasonable); French v. Weld,1995 WL 809563 *2 (Mass. Super. Ct. 1995) ("Pursuit of a claim for payment over two hundred years after maturity of an obligation defeats sound fiscal planning and is per se
unreasonable.").
Even were this passage of over 100 years not negligentper se, Plaintiffs have failed to proffer a legally cognizable excuse for their delay in bringing suit. Even accepting that they are a much more sophisticated generation than that of their ancestors, this excuse is not sufficient because "ignorance of one's legal rights is not a reasonable excuse in a laches case."Pro-Football, Inc. v Harjo, *Page 10 284 F. Supp. 2d 96, 141 (D.D.C. 2003) (remanded on other grounds). Absent any other explanation, excuse, or justification for their delay, Plaintiffs' delay of at least 112 years in bringing this action must be deemed negligent.
In addition, Defendant has suffered great prejudice in defending this action because of this negligent delay. Over the past century, important evidence that could have shed light on the proper title of the Subject Tract has been lost. George R. Hazard, Violet Hazard, Sarah Nomer, and Alex P. Hazard have all passed away. These people could have testified as to the nature of their use and occupancy of the Subject Tract. The parties to the 1909 Boundary Agreement could have testified to the purpose and meaning of the boundary agreement, the surveyor could have done the same, and any party who believed that he or she had been improperly excluded from the boundary agreement could have exercised his or her rights to challenge the agreement while parties, evidence, and witnesses were still in existence.[6] Now-deceased witnesses could have testified about the Defendant's predecessors' possession or control of the easterly portions of the Subject Tract as it pertains to the issue of adverse possession. Importantly, the prospect could have been avoided that Defendant, and its predecessors, after having treated all of the Subject Tract as its own and built upon it a family compound that has been used by the family for generations, would have their right to the land challenged. The existence, location, and use of a now-disputed burial ground could have been confirmed or denied based upon visual examination and the testimony from parties who are no longer living.[7]
Thus, Defendant has proven both elements of laches as a matter of law. Plaintiffs were negligent in waiting 112 years to bring their claim, and Defendant has been prejudiced by this *Page 11 
delay because much of the evidence that it could have used to prove its rightful ownership of the Subject Tract has been lost in the intervening 112 years since the transaction between George R. Hazard and Violet Hazard. Plaintiffs' Complaint is therefore barred by the doctrine of laches.
 2 Adverse Possession
Even assuming, arguendo, that Plaintiffs have standing and that their complaint is not barred by laches, this Court next must address whether their claim of title to the 8 Acre Tract is defeated, as a matter of law, by the doctrine of adverse possession.[8] Defendant argues that regardless of actual title, it holds title to the 8 Acre Tract under the law of adverse possession. (Def.'s Mem. of Law in Supp. of Mot. to Dismiss 3). Defendant claims that it has proven possession that is actual, open, notorious, hostile, under claim of right, continuous, and exclusive. Indeed, it is the Defendant's claim in this regard that forms the gravamen of Count I of its Counterclaim.
Plaintiffs counter that Defendant has not satisfied the elements of adverse possession, as a matter of law, of the 8 Acre Tract. Specifically, Plaintiffs argue that, in the easterly portion of the Subject Tract, Defendant has failed to show the actual, open, notorious, continuous, and exclusive elements of adverse possession. (Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. 8). Plaintiffs maintain that in "the easterly stretches of the [Subject] [P]roperty there has been no more sign of human occupancy, possession or control over the last century than of the vast *Page 12 
stretches of conservation area and forest (much of which is owned by The Nature Conservancy) that extends beyond it." Id.[9]
 i Threshold Questions
In determining the question of adverse possession in this case, this Court will not consider the easterly and westerly portions of the Subject Tract separately in its analysis. The Rhode Island Supreme Court has rejected such an approach. See Dodge v.Lavin, 84 A. 857, 858 (R.I. 1912) (refusing to limit land acquired by adverse possession to "that portion of the strip of land in question actually covered by her `filling in,' growing grass, etc."). For adverse possession cases, "each case must, in the first instance, be determined from the consideration of the facts and circumstances which surround it." Id. Here, the character of the land is such that requiring development of the entire Subject Tract to meet the elements of adverse possession would be nonsensical. The parties agree that the character of the land is remote, rural, hilly, and steep. Defendant has developed the most appropriate areas of the Subject Tract as areas to eat, sleep, cook, and live. The rest of the Subject Tract has been held and maintained in a manner consistent with the desire to keep the land natural and undeveloped while still having areas to walk, hike, and enjoy nature. By the Plaintiffs' own admission, the easterly portion of the Subject Tract is maintained in a manner similar to that of the nearby land maintained by the *Page 13 
Nature Conservancy. (Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. 8). This Court, therefore, will not consider the eastern and western portions of the Subject Tract as separate entities, but rather as one contiguous tract.
 ii Elements of Adverse Possession
Under the adverse possession statute, R.I. Gen. Laws § 34-7-1 (1956), to establish a possessory interest in property adverse to the true owner, a party must prove that its possession was: "`actual, open, notorious, hostile, under claim of right, continuous, and exclusive' for at least ten years."Tavares v. Beck, 814 A.2d 346, 350 (R.I. 2003) (quotingSherman v. Goloskie, 95 R.I. 457, 465 (1963)). A party must show that it "has acted toward the land in question `as would an average owner, taking properly into account the geophysical nature of [the] land.'" Anthony v. Searle,681 A.2d 892, 898 (R.I. 1996) (quoting Gammons v. Caswell,447 A.2d 341, 368 (R.I. 1982)).
In applying these precepts, this Court first finds that Defendant's possession of the Subject Tract has been actual, as Defendant and its predecessors in interest created and maintained permanent structures, including several cabins, a kitchen house, and a primary residence which required the installation of running water and a septic system on the Subject Tract for the entire ten-year period. For the same reason, their possession has been continuous.
The possession of the entire 8 Acre Tract by the Defendant and its predecessors in interest has been open and notorious because, by building and maintaining several permanent structures upon the Subject Tract, they have gone "upon the land openly and [used] it adversely to" the Plaintiffs. Anthony, 681 A.2d at 897-898. Once they went on the Subject Tract and used it openly and adversely, the Plaintiffs became "chargeable with knowing whatever was done only on the land [it allegedly] owned — whether or not it could be observed from the road or from the *Page 14 
boundary of the property." Tavares, 814 A.2d at 352. Defendant and its predecessors in interest "used the [Subject] [P]roperty in a manner consistent with how owners of rural, undeveloped woodlands would typically use such land" and did so "in a manner `calculated to attract attention,' thus placing the world on constructive notice of [their] adverse claim." Id. at 354 (quoting Reitsma v.Pascoag Reservoir Dam, LLC, 774 A.2d 826, 835 (R.I. 2006) (holding that the establishment of a permanent physical structure, combined with continuous maintenance and use for the statutory period, was sufficient to establish adverse possession with respect to that property as a matter of law)).
Moreover, Defendant has satisfied the "claim of right" element of adverse possession by proof that it and its predecessors in interest have created and maintained permanent structures on the Subject Tract. Such building and maintenance over 95 years meets the "claim of right" criterion because it is "an open, visible act . . . accompanied by use of the property in an objectively observable manner that is inconsistent with the rights of the [Plaintiffs]."Id. Tavares, 814 A.2d at 351.
Defendant has satisfied the "hostile" element of adverse possession because it and its predecessors in interest have used the Subject Tract "`inconsistent[ly] with the [alleged] right of the [Plaintiffs], without permission asked or given, . . . such as would entitle the owner to a cause of action against the intruder [for trespass].'" Id. (quoting 16 Powell on RealProperty, § 91.05[1] at 91-23 (2000)). There is no evidence that Defendant or its predecessors in interest ever sought or received Plaintiffs' permission to be on the Subject Tract.
Finally, Defendant has been in exclusive possession of the Subject Tract for longer than the statutory period. In Rhode Island, "to find that [a] property was not used exclusively by the adverse possession claimant, there [must] be evidence indicating that the [challenging party] or *Page 15 
others had made improvements to the land or, at the very least, had used the land in a more significant fashion than merely walking across it." Gammons, 447 A.2d at 368. Here, the Plaintiffs point to family burial (Aff. of Fred M. Hazard April 14 ¶ 3) and walking and enjoying nature on the Subject Tract (Id. at ¶ 6) as actions that have disrupted Defendant's exclusivity. Plaintiffs concede, however, that the last burial was 100 years before the commencement of this action and therefore well before the 10-year adverse possession period. (Id. at ¶ 10). Plaintiffs make no claim that they or their predecessors have visited the graves since the 1907 burial. (See generally id.; Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. 4-6). Moreover, walking and enjoying nature are exactly the type of actions deemed insufficient by the Rhode Island Supreme Court in Gammons to refute exclusivity.Gammons, 447 A.2d at 368.
In summary, this Court finds, by clear and convincing evidence, that the Defendant and its predecessors in interest have possessed the entire Subject Tract in a manner that was open, notorious, hostile, under claim of right, continuous, and exclusive for more than ten years (and in fact decades) prior to the commencement of this action. Defendant, therefore, has proven that Plaintiffs' Complaint is barred as a matter of law by the doctrine of adverse possession with regard to the entire Subject Tract.
 3 Marketable Record Title Act
Finally, Defendant argues that its Motion for Summary Judgment should be granted as well because Defendant and its predecessors in interest have record title to the entire Subject Tract, as endorsed by the Special Master's Report. Defendant seeks to confirm that report to support its summary judgment argument. In response, Plaintiffs contend that Defendants never took title, either by deed or statutory means, to the 8 Acre Tract, which they maintain is situated within the Subject Tract. Plaintiffs accept the Special Master's findings of fact but reject his *Page 16 
legal interpretation of the Marketable Record Title Act and his conclusion that the Act proves title to the entire Subject Tract is in Defendant.
As Plaintiffs' Complaint is barred by laches and, alternatively, by the doctrine of adverse possession, it is not necessary for this Court to reach the issue of whether it is also barred by the Marketable Record Title Act. By extension, therefore, it is not necessary for this Court to rule on the Defendant's Motion to Confirm the Special Master's Report. In addition, to the extent that Defendant seeks to establish title under adverse possession in its Counterclaim, it likewise would be unnecessary for the Court to reach these issues even were Defendant's Counterclaim before it for decision. Even assuming, arguendo, that Plaintiffs' Complaint were not barred by laches and the doctrine of adverse possession, however, this Court would find the reasoning of the Special Master persuasive and an additional reason to grant summary judgment.
 C Special Master's Report 1 Introduction
Following "sound practice," the Special Master "trace[d] the respective parties' title back to a time of common ownership" and found that at one time, the 15, 7 ½ and 8 Acre Tracts were all owned by a man named Cyrus Babcock. (Special Master's Report 2-3.) The Special Master found that Dr. George Hazard acquired the 8 Acre Tract in 1809 from the estate of Cyrus Babcock while George R. Hazard, predecessor in interest to Defendant, acquired title to the 15 and 7 ½ Acre Tracts in 1895 from Violet Hazard after those tracts had changed title owners several times from the time of Cyrus Babcock's ownership.[10] *Page 17 
The Special Master was "unable to bring the title to Dr. Hazard[']s 8-acre woodlot forward to the present [, because] . . . each extended search course attempted end[ed] within a generation of death of Dr. George Hazard without the property being clearly identified in any of the recorded conveyances scrutinized." (Special Master's Report 5). Therefore, "even though there is little doubt that Dr. Hazard's 8-acre woodlot was located in proximity with, and was likely part of, the [S]ubject" Tract, the Special Master could not "assert that its chain of title is part of the [S]ubject [Tract] as Plaintiffs' [sic] claim, as [the Special Master's] research discloses separate and independent chains of title (evaluated for the necessary period of time) control the relevant area." Id.
At that point, the Special Master analyzed title to the Subject Tract under the Rhode Island Marketable Record Title Act, R.I. Gen. Laws §§ 34-13.1-1 et seq. (1956), specifically focusing on whether the 1909 Boundary Agreement could establish record title to the entire Subject Tract in Defendant. The Act provides, in pertinent part, as follows:
 Any person having legal capacity to own land in this state, who has an unbroken chain of title to any interest in land for forty (40) years or more, shall be deemed to have a marketable record title to that interest, . . . A person has such an unbroken chain of title when the land records of the town in which the land is located disclose a conveyance or other title transaction, of record not less than forty (40) years at the time the marketability is to be determined.
R.I. Gen. Laws § 34-13.1-2 (1956) (emphasis added). The Act defines a "title transaction" as:
 any transaction affecting title to any interest in land, including, but not limited to, title by will or descent, title by tax deed, by public sale, by trustee's, referee's, guardian's, executor's, administrator's, *Page 18 
conservator's, Tax collector's, sheriff's, commissioner's, constable's warranty or quitclaim deed, by mortgagee's deed or by decree of any court.
Id. (emphasis added).
The Special Master found that by affording the Act a liberal construction, the 1909 Boundary Agreement is a "title transaction" under the Act. The Special Master specifically stated in this regard that he "subscribe[d] to [the] reasoning" that the 1909 Boundary Agreement was a sufficient "title transaction." (Special Master's Report 13.) As that title transaction reflected an unbroken chain of title in Defendant for more than forty years, it gave marketable record title of the entire Subject Tract, under the Act, to Defendant. The Special Master conceded, however, that the question of whether the Act should be afforded such a liberal interpretation "may be one for the Court to [decide.]"Id. at 12.
 2 Analysis
Both parties agree with all of the factual findings in the Special Master's Report. In fact, the parties only disagree as to the Special Master's conclusion of law suggesting that the 1909 Boundary Agreement is a sufficient title transaction under the Marketable Record Title Act.
Plaintiffs argue that the 1909 Boundary Agreement does not meet the definition, articulated in R.I. Gen. Laws § 34-13.1-1, of a "title transaction." They suggest that "the definition of `title transaction' in the [Act] focuses on instruments ofconveyance" and claim that the 1909 Boundary Agreement "lack[s] the dignity, prominence, or trustworthiness of an actual conveyance." (Pl's. Mem. in Opp'n to Def.'s Mot. to Confirm Special Master's Report 11 (emphasis in original)). Plaintiffs contend that Defendant has not provided this Court with any precedent, from Rhode Island or any other jurisdiction, of a Boundary Agreement or similar document being recognized as a title transaction for the purposes of a governing statute. *Page 19 
This Court finds that the Special Master logically applied the Marketable Record Title Act to the 1909 Boundary Agreement and used that agreement as a root of title, as the devolution of the 8 Acre Tract is far from clear. Although "the vagaries of 19th century description [and] the lack of any courses, angles or distances contained in the descriptions of earliest described component parcels" prevented the Special Master from completing the chain of title of the 8 Acre Tract, the 1909 Boundary Agreement provided a clear statement of relative ownership, albeit without all interested persons being parties to that agreement, that has stood unchallenged for 100 years. (Special Master's Report 10.) While admittedly the 1909 Boundary Agreement is not an "instrument of conveyance" under this Act, it is in this Court's judgment a "title transaction."
The Subject Tract certainly would seem a good candidate for application of the Marketable Record Title Act, as the "purpose [of the statute] is to facilitate and simplify land title transactions" for parties with unbroken chains of title for forty years or more.Bitting v. Gray, 897 A.2d 25, 33 (R.I. 2006). The Plaintiff has failed to provide any precedent from any jurisdiction stating that a document similar to the 1909 Boundary Map would not suffice as a "title transaction." Such an interpretation also logically squares with the doctrine of adverse possession. Most importantly, it is of great significance to this Court that a mutually-selected title examiner of Mr. Soloveitzik's stature with over thirty years of experience in his field would champion an interpretation of the Act that would resolve the instant title dispute in this fashion. The Special Master's interpretation of the Act is analogous to an administrative agency's interpretation of its enabling statute, as the Special Master is universally regarded as an expert on land titles. See In re Lallo, 768 A.2d 921, 926 (R.I. 2001) ("The law in Rhode Island is well settled that an administrative agency will be accorded great deference in interpreting a statute *Page 20 
whose administration and enforcement have been entrusted to the agency."); Gallison v. Bristol School Committee,493 A.2d 164, 166 (R.I. 1985) ("where the provisions of a statute are unclear or subject to more than one reasonable interpretation, the construction given by the agency charged with its enforcement is entitled to weight and deference as long as that construction is not clearly erroneous or unauthorized"). Thus, the Special Master's analysis should be afforded great deference and given great weight.
Accordingly, this Court adopts the findings of fact made by the Special Master, consistent with the agreement of the parties, and also accepts his conclusion of law that the 1909 Boundary Agreement is a sufficient title transaction under the Marketable Record Title Act, as an alternative ground to grant summary judgment in favor of the Defendant. To that extent, the Special Master's Report is confirmed.
 IV Conclusion
For the reasons stated in this Decision, this Court grants Defendant's Motion for Summary Judgment. This Court concludes that the Plaintiffs have not established that they have standing as the putative heirs of Dr. George Hazard to bring their declaratory judgment action to establish ownership of the 8 Acre Tract, but it nonetheless proceeds to address the merits of Plaintiffs' Complaint because Defendant has not sought judgment against Plaintiffs for lack of standing and the issues are deserving of resolution on their merits to attempt to quiet title to the property at issue. In granting summary judgment, this Court holds that Plaintiffs' declaratory judgment action is barred by the doctrine of laches; Plaintiffs here have delayed over 100 years in bringing suit, to the prejudice of the Defendant, as valuable evidence and testimony have been permanently lost and Defendant, and its predecessors, for generations have used the property with no notice of any adverse claim. Alternatively, this Court holds, as a matter of law, that *Page 21 
Plaintiffs' Complaint is barred by the doctrine of adverse possession in that Defendant has proven, clearly and convincingly, that its possession of the Subject Tract, and that of its predecessors in interest, has been actual, open, notorious, hostile, under claim of right, continuous, and exclusive for well more than the ten year statutory term of years so as to defeat Plaintiffs' claim to title. Even assuming, arguendo, that Plaintiffs' Complaint is not barred by laches and, alternatively, adverse possession, the factual findings and conclusions of law of the Special Master suggest that Defendant is entitled to summary judgment on the grounds that the Marketable Record Title Act recognizes the 1909 Boundary Agreement as a title transaction sufficient to reflect title to the property in Defendant. To that extent, therefore, the Report of the Special Master is confirmed.
Counsel shall confer and submit to this Court forthwith for entry an agreed upon form of order and judgment that is consistent with this Decision.
[1] George R. Hazard is a person distinct from Dr. George Hazard. George R. Hazard died in 1934 and was the predecessor in interest to Defendant. Dr. George Hazard died in 1829 and was, allegedly, the father of Alexander P. Hazard.
[2] Although the Plaintiffs never formally amended their Complaint, it appears that the Plaintiffs have abandoned this theory — i.e., the "1895 deed from Violet Hazard to George R. Hazard . . . was . . . defective in that Violet Hazard lacked the capacity to execute" that document (Compl. ¶ 3). Plaintiffs have failed to raise the issue in any of their written memoranda or oral arguments to this Court. Indeed, Plaintiffs have gone so far as to admit that "[w]hatever was conveyed by [the] 1895 Violet Hazard deed is what the [D]efendant owns today." (Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. 8). This Court concludes, therefore, that the Plaintiffs rely only on their purported interest in the 8 Acre Tract as the heirs of Dr. George Hazard in seeking declaratory relief.
[3] While styled a Memorandum of Law in Support of Defendant's Motion to Dismiss, it is in content a memorandum in support of Defendant's Motion for Summary Judgment.
[4] It is somewhat ironic to this Court that Defendant now endorses the Special Master's Report and Plaintiffs oppose it in part, as it was Plaintiffs who sought appointment of a Special Master and Defendant who reluctantly agreed to the Court's decision to appoint.
[5] Despite the fact that the Defendant is not asking this Court to dismiss this case for lack of standing, this Court first will address whether Plaintiffs have standing to bring this action before considering the case on its merits. "The standing inquiry is satisfied when a plaintiff has suffered `some injury in fact, economic or otherwise.'" N M Properties,964 A.2d 1141, 1145 (R.I. 2009) (citing Bowen v. Mollis,945 A.2d 314, 316 (R.I. 2008)). Plaintiffs argue that they have standing because Alexander P. Hazard gained an interest in the 8 Acre Tract through intestate succession upon the death of Dr. George Hazard. Yet, Alexander P. Hazard, as a matter of law, could not have acquired an interest in the 8 Acre Tract via intestate succession in 1829 because, under Rhode Island law at the time, he was not an heir capable of inheriting from Dr. George Hazard. Rhode Island common law, at the time of Dr. George Hazard's death, held that an out-of-wedlock child "could be next of kin to nobody." Briggs v. Greene, 10 R.I 495, 497 (R.I 1873). Thus, Alexander P. Hazard, as an out-of-wedlock child, could not have been an intestate successor to Dr. George Hazard at the time of Dr. George Hazard's death. Subsequent ameliorative statutes and case law have abolished the harsh common law rule which barred intestate succession for out-of-wedlock children, but have not stated that such changes should be applied retroactively to 19th century cases. See, e.g., R.I. Gen. Laws § 33-1-8 (1956); In Re Estate of Cherkas,506 A.2d 1029; Rekowski v. Cucca, 542 A.2d 664 (R.I. 1988). It appears to this Court, therefore, that Plaintiffs, as the putative heirs of Alex P. Hazard, lack standing to bring this action. However, as Defendant has not asked this Court, as part of its motion for Summary Judgment or otherwise, to grant it judgment as a matter of law on the grounds that Plaintiffs lack standing, and as the title questions in this case are potentially "capable of repetition, yet evading review," this Court will proceed to address the merits of the pending motion. See Morris v.D'Amario 416 A.2d 137, 139 (R.I. 1980).
[6] Furthermore, were it still at issue, witnesses who had known or examined Violet Hazard could have testified as to her capacity to convey the Subject Tract in 1895.
[7] Evidence as to standing also could have been presented.
[8] The Rhode Island Supreme Court recently criticized the doctrine of adverse possession, but did not eliminate it as a cause of action. See Cahill v. Morrow,2011 WL 175234 *5 (R.I. 2011) ("Although this Court duly recognizes its role as the judicial arm of government tasked with applying the law, rather than making law, it is not without an eyebrow raised at the ancient roots and arcane rationale of adverse possession that we apply the doctrine to this modern property dispute.").
[9] Although in their pleadings and at oral argument Plaintiffs also sought to defeat a showing of adverse possession by arguing that the remnants of an old burial ground of their family exists on the 8 Acre Tract, they later conceded in representations to this Court that the alleged graveyard sits on the 15 Acre Tract, to which they make no claim of title. The alleged graveyard, therefore, is irrelevant to this Court's consideration of Defendant's adverse possession claim. Moreover, Plaintiffs also now concede, notwithstanding their earlier representations in their memoranda and arguments, that the putative graveyard is on property that is bisected by a driveway created by the Defendant's predecessors in interest before 1953 and used by Defendant and its predecessors exclusively since that time. As such, the construction and use of a driveway would be sufficient notice to a record title holder that another party was claiming a right to this piece of land.See Tavares, 814 A.2d at 352-353.
[10] Owners of the 7 ½ Acre Tract between Cyrus Babcock and Violet Hazard were: from 1811-1832: Peleg Brown and William Brown; from 1832-1859: George Champlin; from 1859-1862: Alexander P. Hazard; in 1862: Benjamin C. Perry, who, in that same year, transferred title to Violet Hazard.
Owners of the 15 Acre Tract between Cyrus Babcock and Violet Hazard were: from 1809-1816: John Segar; from 1816-1825: Joseph Segar; from 1825-1838: John Segar; from 1838-1839: Benjamin C. Carpenter, Jr.; from 1839-1846: Nathan S Webster; from 1846-1851: Benjamin C. Perry; in 1851: Clinton Clark; also in 1851: Benjamin C. Perry, who, in 1852, transferred title to Violet Hazard. *Page 1